2019 UT App 90

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
VILIAMU SEUMANU,
Appellant.

Opinion
No. 20150593-CA
Filed May 23, 2019

Third District Court, Salt Lake Department
The Honorable Randall N. Skanchy
No. 141900236

Brett J. DelPorto, Attorney for Appellant

Sean D. Reyes and Kris C. Leonard, Attorneys
for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and DIANA HAGEN
concurred.

MORTENSEN, Judge:

¶1     In retaliation for a drug deal gone sideways, Chris Leech orchestrated the kidnapping of two individuals (Middleman and Victim). Leech and several other individuals—including defendant Viliamu Seumanu—held, bound, and transported Middleman and Victim to a remote location in Weber Canyon. There, Leech shot Victim and then told Middleman to shoot Victim or else Leech would kill Middleman. Middleman complied. Seumanu, under the orders of Leech, later destroyed all physical evidence of the murder. Seumanu was charged with murder, aggravated kidnapping of Victim and Middleman, and obstruction of justice. A jury convicted Seumanu on all charges.

He appeals one of the aggravated kidnapping convictions for which he was sentenced to life without parole. We affirm.

## BACKGROUND

### *The Murder*

¶2 Middleman was supposed to deliver four ounces of methamphetamine to a distributor (Soules) waiting at a local residence (Residence). Middleman could not reach his supplier and, therefore, could only procure two ounces. During the additional two-day wait to get more methamphetamine, Middleman confided his problem to Victim, who offered to get the remaining two ounces for a little more money. After Middleman was yet again unable to reach his supplier, he accepted Victim's offer to get the additional two ounces without notifying Soules of the deal or the price increase.

¶3 Middleman waited at a friend's house while Victim went to get the drugs. Victim took longer than expected and stopped answering his phone when Middleman called. This caused Middleman to begin ignoring Soules's repeated requests for an update on where the drugs were.

¶4 After waiting several hours, Middleman had Soules pick him up. Together, they went to the Residence, where Middleman told Soules about Victim and how Victim was now in charge of procuring the additional two ounces of methamphetamine. Soules complained that she had customers waiting and urged Middleman to get the problem taken care of before Leech arrived. Soon thereafter, Leech arrived at the Residence.

¶5 Upon arrival, Leech pulled out a gun and asked Middleman what was going on. Middleman tried to assure Leech that he was dealing with it, to which Leech replied that he had better get it done "or it was [Middleman's] ass." After this exchange, Leech left a man with a gun in the garage with

Middleman and refused to let Middleman leave. Around this time, Seumanu and several others arrived at the Residence.

¶6     In an effort to find and punish Victim, four men—Leech, Seumanu, Middleman, and one other (Myore)—left the Residence and went to an apartment where Victim was supposed to meet Soules. When Victim arrived at the apartment, Leech pulled a gun out and ordered Victim and Middleman to lie face down, side-by-side, on the floor. Leech then frisked them both, removed their shoes, and emptied their pockets. Victim tried to explain that he had the additional two ounces of drugs, but Leech told him to shut up. Leech then ordered Myore to blindfold both men and tie their hands behind their backs, which he did. While there were other people present in the room, including Seumanu, no one tried to stop Leech.

¶7     In the early morning hours, Myore transferred Middleman and Victim to the backseat of Myore's truck. Seumanu sat in the backseat next to Middleman and Victim. Myore then drove Leech, Seumanu, Victim, and Middleman to an abandoned road in Weber Canyon, stopping once for gas. During their travels, Victim pleaded for his life and asked them not to follow through with their plan. He promised not to say anything to anyone, but Leech said it was already "too late."

¶8     Leech asked Myore for his firearm, and Myore complied. On Leech's order, Seumanu opened the door of the truck and escorted Middleman and Victim approximately 100 yards down a hill. There, after their faces were uncovered, Middleman looked to Victim, who said, "I guess this is it," and, "I'm sorry, bro." Leech then shot Victim in the back.

¶9     Next, Leech unbound Middleman's hands. He then handed his gun to Middleman and said, "There's your home boy, you finish it or I'm going to kill you." Middleman attempted to fire a single shot at Victim, but the gun jammed. Middleman quickly gave the gun back to Leech, who ordered Seumanu to point a different gun at Middleman's head.

Seumanu did so, and once the original gun was unjammed, Leech gave it back to Middleman. With a gun pressed against the back of Middleman's head, Middleman shot Victim.

¶10    Victim was left alone where he was shot, and the four other men—Leech, Seumanu, Myore, and Middleman—left in the truck. On the way back to the Residence, Leech directed everyone to pretend they were still trying to find Victim. Leech further ordered Myore to clean, vacuum, and shampoo the truck, and he told Seumanu to burn everything belonging to Victim and Middleman. Myore and Seumanu complied.

*The Investigation*

¶11    Several months later, detectives from the West Valley City Police Department discovered Victim's body. Police interviewed many of the people present the night of the murder, including Seumanu. During Seumanu's interview, he claimed that he did not know what the officers were talking about and stated that "it had been a while since he'd seen" Middleman; and he last saw Victim three or four months earlier smoking outside an apartment complex in Taylorsville. When pressed further, Seumanu changed his story, admitting that he had been at the Residence with Soules, Myore, Leech, Middleman, and Victim.

¶12    Seumanu then admitted that he waited for Victim at the Residence along with Soules, Myore, Middleman, and Leech; he got into Myore's truck and went into the mountains; the group stopped for gas on the way to Weber Canyon; they drove about an hour; and they parked near a gate and everyone else got out while he remained at the truck. Seumanu eventually told police that Leech and Myore walked Middleman and Victim down a hill while he followed, that he watched Leech shoot Victim, saw Leech and Middleman walk toward Victim's body, and saw Middleman shoot Victim. Finally, Seumanu stated that when they returned from Weber Canyon, Myore and Leech took care of destroying evidence while he went home.

*The Proceedings*

¶13   Over a year before trial, the State filed charges against Seumanu as an accomplice to one count of murder, two counts of aggravated kidnapping, and one count of obstruction of justice (Information).[1] Count 3 in the Information is titled "AGGRAVATED KIDNAPPING" and makes specific reference to the aggravated kidnapping statute: Utah Code section 76-5-302. The Information also contains the State's probable cause statement describing Seumanu's role in the kidnapping and that during the course of Middleman's kidnapping, Victim was shot and killed.

¶14   On the morning of trial, Seumanu received the State's proposed verdict form (Verdict Form), proposed special verdict form (Special Verdict Form), and proposed jury instruction 40 (Instruction 40). The Verdict Form listed the charges—including count 3 for aggravated kidnapping—and required the jury to indicate whether Seumanu was guilty or not guilty on each charge. The Special Verdict Form required the jury to indicate whether it found "beyond a reasonable doubt" that "[d]uring the course of the commission of the Aggravated Kidnapping of [Middleman,] [Seumanu], as a party, caused serious bodily injury to [Victim]"—which, if found, could result in a sentence of life without parole. Instruction 40 defined the "as a party" language used in the Special Verdict Form. Specifically, Instruction 40 stated that "a person can commit a criminal offense even though that person did not personally do all of the acts that make up the offense" if "(1) the defendant had the mental state required to commit the offense, and (2) the defendant solicited, requested, commanded, encouraged, or intentionally aided another to commit the offense, and (3) the

---

1. The State filed a first amended Information on March 18, 2015, and a second amended Information on March 24, 2015. Neither amendment contains significant changes to the aggravated kidnapping charge or facts relevant to that charge.

offense was committed." When Seumanu's counsel received the Verdict Form, the Special Verdict Form, and Instruction 40, he did not object, request a continuance, or indicate that he was unprepared to proceed with trial.

¶15 At trial, Seumanu claimed that his presence at the murder was coerced by Leech and that his actions did not contribute to the murder. His wife (Wife) also testified that she attempted to persuade Leech not to do anything, but he was "gone in his mind" and would not listen. She claimed that she attempted to prevent Leech from taking Seumanu with him, but in response, Leech pointed his gun at her and insisted that Seumanu would be leaving with him. And only then did Seumanu agree to go. Finally, she testified that Seumanu returned the next morning and called her to pick him up at the Residence.

¶16 At least two accomplice witnesses also testified that (1) Seumanu had a gun at some point on the night of the murder; (2) Leech handled two guns at the murder scene while Seumanu stood close by; (3) Seumanu was present for the drive up Weber Canyon; (4) Seumanu hiked to the murder scene with Leech, Middleman, and Victim; (5) Seumanu returned to the Residence with the others; and (6) Leech ordered Seumanu to burn everything belonging to Middleman and Victim. The trial court did not specifically provide a cautionary instruction on accomplice testimony, but it did provide a general credibility instruction educating jurors generally on witness credibility, including explicit instructions to consider whether any witnesses had a personal interest in the outcome of the trial or had some other bias or motive to testify a certain way.

¶17 After the evidence phase of trial, the parties discussed the jury instructions and verdict forms. This time, Seumanu objected to the Special Verdict Form on the grounds that he had not received notice in the Information that the State was seeking a life without parole sentence. The court overruled the objection and allowed the State's Special Verdict Form to be submitted to

the jury. The court also allowed the Verdict Form and Instruction 40 as proposed by the State to be submitted to the jury.

¶18 The jury convicted Seumanu on all charges and further found, beyond a reasonable doubt, that Seumanu had caused serious bodily injury to Victim during the commission of the aggravated kidnapping of Middleman. The judge ultimately imposed the statutory indeterminate sentences for three of the four felony convictions and life without parole for one of the aggravated kidnapping convictions. Seumanu appeals.

ISSUES AND STANDARDS OF REVIEW

¶19 Seumanu raises three issues on appeal. First, he asserts that he is entitled to a new trial because his Sixth Amendment right to be given fair notice of the charges against him was violated when the State failed to provide adequate notice that it would seek a factual finding of "serious bodily injury" under the aggravated kidnapping statute.[2] "A claim of

---

2. Seumanu does not challenge his conviction of aggravated kidnapping, which is punishable by a term of imprisonment of fifteen years to life. Utah Code Ann. § 76-5-302(3)(a) (LexisNexis 2017). Rather, he argues that the State failed to provide adequate notice that if "the trier of fact finds that during the course of the commission of the aggravated kidnapping the defendant caused serious bodily injury to another," he could be sentenced to life without parole. *Id.* § 76-5-302(3)(b). Thus, if we were persuaded on this issue, Seumanu would, at best, be entitled to resentencing for his aggravated kidnapping conviction. *See State v. Helmick*, 2000 UT 70, ¶ 12, 9 P.3d 164; *see also State v. Bryant*, 2012 UT App 264, ¶ 20, 290 P.3d 33 (holding that because "life without parole was not an available sentencing option" the defendant was entitled only to be "resentenced on his aggravated kidnapping conviction").

inadequate notice presents a question of law that we review for correctness." *State v. Bragg*, 2013 UT App 282, ¶ 17, 317 P.3d 452.

¶20 Second, Seumanu argues that his defense counsel provided ineffective assistance by not objecting to the "as a party" language in the Special Verdict Form and/or Instruction 40, which defined the term. When a defendant argues that his counsel was ineffective for the first time on appeal, there is no ruling for this court to review and the issue presents a question of law. *See State v. Ott*, 2010 UT 1, ¶ 16, 247 P.3d 344.

¶21 Third, Seumanu argues that the trial court plainly erred by not sua sponte providing a cautionary jury instruction on accomplice testimony. Ordinarily, claims regarding alleged errors in the jury instructions are reviewed for correctness. *See State v. Malaga*, 2006 UT App 103, ¶ 7, 132 P.3d 703. But because Seumanu failed to preserve the issue, we review for plain error. *Id.*[3]

---

3. Seumanu further contends that pursuant to rule 23B of the Utah Rules of Appellate Procedure, a remand is necessary for the trial court to make findings on whether a cautionary instruction on accomplice testimony was required. "The purpose of Rule 23B is for appellate counsel to put on evidence he or she now has, not to amass evidence that might help prove an ineffectiveness of counsel claim. To this end, appellate counsel is required to submit affidavit evidence setting forth nonspeculative facts showing the alleged deficient performance of trial counsel." *State v. Bragg*, 2013 UT App 282, ¶ 24 n.6, 317 P.3d 452 (cleaned up). Seumanu has failed to file both a separate motion and an affidavit and instead attempts to bring this motion by simply adding his rule 23B argument to the body of his appellate brief. This is insufficient. *See id.* For this reason, we decline to address this issue further.

ANALYSIS

## I. Notice of Intent to Seek a Finding of "Serious Bodily Injury"

¶22    Seumanu contends that the State violated his Sixth Amendment right to fair notice of the charges against him because it failed to provide adequate notice that it intended to seek a factual finding of "serious bodily injury" which, if found beyond a reasonable doubt by the jury, would result in a sentence of life without parole. After oral argument, we ordered supplemental briefing for clarification on two key issues: (A) whether a finding of "serious bodily injury" is an element of the offense under *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and its progeny *Alleyne v. United States*, 570 U.S. 99 (2013), and if so, whether the State was required to allege it in the Information; and (B) whether the State was required to give Seumanu pre-trial notice that it would seek a finding of "serious bodily injury." We discuss each in turn.

### A.    Element of the offense under *Apprendi* and *Alleyne*

¶23    The United States Supreme Court, in *Apprendi*, held that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. This holding was expanded to mandatory minimum sentences in *Alleyne*, 570 U.S. 99.[4]

---

4. The Supreme Court in *Apprendi* and *Alleyne* reasoned that requiring such facts to be considered elements of the offense "enables the defendant to predict the legally applicable penalty from the face of the indictment." *Alleyne*, 570 U.S. 99, 114 (2013) (citing *Apprendi*, 530 U.S. 466, 478–79 (2000)). Here, however, Seumanu has conceded that the element of "serious bodily injury" was not required on the face of the Information. *See infra* ¶ 26. Therefore, we limit our analysis to whether a finding of

(continued…)

¶24   Seumanu argues that "[a] finding of serious bodily [injury] is an element of aggravated kidnapping because it increases the penalty from 15-years-to-life to life without parole." Seumanu continues, "Because a finding that Seumanu 'caused serious bodily injury to another' is a factual finding . . . that extended Mr. Seumanu's prison stay from a minimum of 15 years—with the possibility of parole—to life without parole, *Apprendi* and *Alleyne* require . . . it to be a factual finding that must be determined by a jury."

¶25   Even assuming that Seumanu is correct, and without directly deciding the issue, he has conceded that the finding of serious bodily injury was submitted to the jury and found beyond a reasonable doubt as required by *Apprendi* and *Alleyne*.[5] First, it is undisputed that the Special Verdict Form required the jury to indicate whether it found "beyond a reasonable doubt" that "[d]uring the course of the commission of the Aggravated Kidnapping of [Middleman,] [Seumanu], as a party, caused serious bodily injury to [Victim]." Second, Seumanu concedes

---

(…continued)
"serious bodily injury" should have been submitted to the jury and proved beyond a reasonable doubt.

5. The State argues that "neither *Apprendi* nor *Alleyne* applies to transform the [finding of serious bodily injury] into an element" because it is merely a "sentencing factor" that establishes a presumptive sentence for a particular type of aggravated kidnapping. The State cites *LeBeau v. State*, 2014 UT 39, 337 P.3d 254, to support its argument that "[t]he sentencing scheme does not enhance a sentence for a conviction but, based on two identified sentencing factors, determines which sentence in the range of possible sentences is the appropriate presumptive sentence to be assigned to a particular conviction." However, because Seumanu has conceded that the element of serious bodily injury was submitted to a jury and proved beyond a reasonable doubt, we decline to address the State's argument.

that he was "convicted of aggravated kidnapping" and that "*jurors* also found . . . [that] he actually caused serious bodily injury." (Emphasis added.) Thus, Seumanu was not deprived of his due process right to have elements of the crime charged submitted to a jury and proved beyond a reasonable doubt.

¶26  To be clear, while Seumanu asserts on appeal that serious bodily injury is an element under *Apprendi* and *Alleyne*, he does not contend that it is an element that must be alleged in the Information. The parties were ordered to provide supplemental briefing on the issue of whether serious bodily injury is an "element of the offense" under *Apprendi* and *Alleyne*, and if so, whether it must be alleged in the Information. To the direct question posed in our order for supplemental briefing—must an element of serious bodily injury be alleged in the information—Seumanu answered, "No." We therefore consider the issue conceded and decline to address it further.[6]

B.     Pre-Trial notice

¶27  Seumanu does contend, however, that the "State should have—and did not—apprise [him] of its intent to seek a factual finding of serious bodily injury under [Utah Code section 76-5-302(3)(b)]." We disagree.

¶28  "The right of an accused to know the nature of the offense with which he is charged is a fundamental right guaranteed by both our federal and state constitutions." *State v. Nelson-Waggoner*, 2004 UT 29, ¶ 17, 94 P.3d 186. These constitutional

---

6. The State notes that "the question of whether *Apprendi*-type elements must be alleged in an Information has not been decided in this jurisdiction." While we need not address the issue on the merits, we note that in practice it would be prudent for prosecutors to provide as express a notice as possible in order to be more clear to defendants and to avoid attacks on the sufficiency of the notice.

protections "ensure that the accused is given sufficient information so that he or she can know the particulars of the alleged wrongful conduct and can adequately prepare his or her defense." *State v. Klenz*, 2018 UT App 201, ¶ 34, 437 P.3d 504 (cleaned up). Thus, "ultimately, as long as a defendant is sufficiently apprised of the State's evidence upon which the charge is based so that the defendant can prepare to meet that case, the constitutional requirement is fulfilled." *Id.* ¶ 35 (cleaned up).

¶29 Here, Seumanu's contention that only "after the close of evidence, [was] defense counsel . . . told in court that he should have prepared a defense to a different crime, i.e., that Seumanu caused serious bodily injury," is not supported by the record. The record shows that Seumanu was given adequate notice of his charges, first in the Information and second in the Special Verdict Form—both of which were received before trial.

¶30 Seumanu was provided sufficient pre-trial notice of the serious bodily injury element in the Information. Count 3 in the Information identifies aggravated kidnapping by both name and section of the Utah Code. And where the aggravated kidnapping statute provides that "[a]ggravated kidnapping is . . . punishable by a term of imprisonment of . . . life without parole, if the trier of fact finds that during the course of the commission of the aggravated kidnapping the defendant caused serious bodily injury to another," Utah Code Ann. § 76-5-302(3)(b) (LexisNexis 2017),[7] Seumanu was unmistakably provided with sufficient pre-trial notice of his possible sentence if convicted, *see State v. Preece*, 971 P.2d 1, 6 (Utah Ct. App. 1998) (holding that "an information was not defective where it specifically provided the offense's statutory name and the section proscribing the relevant conduct" because a defendant is responsible for "familiarizing himself

---

7. Because the statutory provision in effect at the relevant time does not differ in any material way from the provision now in effect, we cite the current version of the Utah Code.

with the actual language of the statute under which he had been charged").

¶31    Further, Seumanu was provided with pre-trial notice vis-à-vis the factual allegations in the Information. Specifically, the serious bodily injury attributed to Seumanu was the murder of Victim, which occurred during the commission of the joint kidnapping. The probable cause statement appended to the Information elaborated on this allegation by describing the kidnapping, the fact that Victim was shot twice, and when and where during the kidnapping Victim was shot. Thus, the State provided Seumanu with ample written notice in the Information that the State intended to prove that serious bodily injury was inflicted during the commission of the kidnapping. *See State v. Martinez*, 896 P.2d 38, 41 (Utah Ct. App. 1995) ("[T]he State need only allege the circumstance necessary to invoke the enhancement statute in order to provide adequate due process."); *see also State v. Pham*, 2016 UT App 105, ¶ 26, 372 P.3d 734 ("Because being shot can lead to death, it is not inherently unreasonable for a jury to find that a particular shooting resulted in serious bodily injury by creating a substantial risk of death.").

¶32    Seumanu was also provided sufficient notice of the State's intent to seek a finding of serious bodily injury in the Special Verdict Form, which he received prior to trial.[8] The Verdict Form listed each charge—including count 3—and required the jury to indicate whether Seumanu was guilty or not guilty of each. The

---

8. Seumanu, in his briefing, infers that defense counsel was not made aware of the Special Verdict Form until after the close of evidence. However, the record reflects that defense counsel received the Special Verdict Form at 7:25 a.m. on March 30, 2015—more than six hours before court convened for jury selection. Importantly, having received this notice in writing before the commencement of trial, Seumanu cannot claim he would have conducted trial differently had he known that the State would be submitting the Special Verdict Form.

Special Verdict Form further required the jury to indicate whether it found "beyond a reasonable doubt" that "[d]uring the course of the commission of the Aggravated Kidnapping of [Middleman,] [Seumanu], as a party, caused serious bodily injury to [Victim]." The Verdict Form and Special Verdict Form, taken together, provide clear notice that the State intended to seek a conviction of aggravated kidnapping under count 3 and a finding of serious bodily injury.

¶33 In sum, we hold that the serious bodily injury component was properly submitted to the jury and proved beyond a reasonable doubt. We further hold that Seumanu was given adequate pre-trial notice of the State's intention to pursue a factual finding of serious bodily injury.[9]

## II. Ineffective Assistance

¶34 Next, Seumanu argues that his trial counsel was ineffective for not objecting to (1) the "as a party" language in the Special Verdict Form and/or (2) Instruction 40, which defined the phrase "as a party" in terms of accomplice liability. His position is grounded on the premise that the aggravated kidnapping statute requires that he personally cause serious bodily injury to another during the kidnapping to be subject to a sentence of life without parole. In other words, Seumanu argues that accomplice liability cannot attach to aggravated kidnapping because that statute is phrased in terms of direct liability, not

---

9. Seumanu also argued that his defense counsel was ineffective for failing to object to the Special Verdict Form on the ground that notice was inadequate. However, we conclude that Seumanu's counsel was not ineffective because pre-trial notice was adequate, and therefore any objection on that ground would have been futile. *See State v. Christensen*, 2014 UT App 166, ¶ 10, 331 P.3d 1128 ("The failure to raise futile objections does not constitute ineffective assistance of counsel." (cleaned up)).

indirect liability. And therefore, his counsel's failure to object constitutes ineffective assistance. We disagree.

¶35 First, we reject Seumanu's argument that accomplice liability cannot attach to criminal statutes that are phrased in terms of direct, rather than indirect, liability. *See, e.g.*, Utah Code Ann. § 76-5-302(3)(b) (LexisNexis 2017) (providing that aggravated kidnapping is punishable by a term of life without parole "if the trier of fact finds that during the course of the commission of the aggravated kidnapping *the defendant caused* serious bodily injury to another" (emphasis added)); *id.* § 76-5-202(1) ("Criminal homicide constitutes aggravated murder if *the actor . . . causes* the death of another." (emphasis added)). Indeed, as a general matter, accomplice liability can, and does, attach to criminal liability arising from statutes that are phrased only in terms of direct liability. *See State v. Clark*, 2014 UT App 56, ¶ 55, 322 P.3d 761 (affirming convictions of an accomplice to "one count of aggravated murder, two counts of attempted aggravated murder, three counts of aggravated kidnapping, one count of aggravated burglary, one count of aggravated robbery, and one count of aggravated cruelty to animals").[10]

¶36 Second, because accomplice liability can attach to aggravated kidnapping, the Special Verdict Form and Instruction 40 accurately instructed the jury on the law. The

---

10. A nearly identical challenge to the application of accomplice liability was rejected by our supreme court in *State v. Briggs*, 2008 UT 75, 197 P.3d 628. The court in *Briggs* held that the State was not required to prove constructive possession before the defendant could be convicted as an accomplice to the crime of possession. *Id.* ¶ 20 ("If we were to hold that it is necessary for an accomplice to be in actual possession of the contraband before accomplice liability could be established, the State could charge someone as an accomplice only when he or she had acted as a principal. Accomplice liability would cease to have any independent function.").

general rule is that an accurate instruction upon the basic elements of an offense is required. *State v. Beckering*, 2015 UT App 53, ¶ 23, 346 P.3d 672. "To determine if jury instructions correctly state the law, we look at [them] in their entirety and will affirm when the instructions taken as a whole fairly instruct the jury on the law applicable to the case." *Id.* (cleaned up).

¶37 Instruction 40 correctly instructed the jury that Seumanu could be found guilty on an accomplice liability theory. Utah's accomplice liability statute provides that a defendant is liable for criminal conduct if, "acting with the mental state required for the commission of an offense," he "solicits, requests, commands, encourages, or intentionally aids another person to engage in conduct which constitutes an offense." Utah Code Ann. § 76-2-202 (LexisNexis 2017). Instruction 40 stated that "a person can commit a criminal offense even though that person did not personally do all the acts that make up the offense" if "(1) the defendant had the mental state required to commit the offense, and (2) the defendant solicited, requested, commanded, encouraged, or intentionally aided another to commit the offense, and (3) the offense was committed." In our view, Instruction 40 properly instructed the jury that Seumanu could be found guilty, "as a party," under the theory of accomplice liability.

¶38 Similarly, the Special Verdict Form correctly instructed the jury on aggravated kidnapping. The aggravated kidnapping statute, in relevant part, provides that the crime is "a first degree felony punishable by a term of imprisonment of . . . life without parole, if the trier of fact finds that during the course of the commission of the aggravated kidnapping the defendant caused serious bodily injury to another." Utah Code Ann. § 76-5-302(3)(b). The Special Verdict Form stated that the jury was required to indicate whether it found "beyond a reasonable doubt" that "[d]uring the course of the commission of the Aggravated Kidnapping of [Middleman,] [Seumanu], as a party, caused serious bodily injury to [Victim]." Thus, aside from the "as a party" phrase, the Special Verdict Form is a verbatim

recital of the serious bodily injury clause of the aggravated kidnapping statute.

¶39 Taken as a whole, Instruction 40 and the Special Verdict Form correctly instructed the jury on accomplice liability as applied to aggravated kidnapping. In light of the fact that accomplice liability can, and does, extend criminal liability arising from statutes that are phrased in terms of direct liability, *see Clark*, 2014 UT App 56, ¶ 55, and that Instruction 40 adequately describes the theory of accomplice liability, *see* Utah Code Ann. § 76-2-202, the phrase "as a party" as used in the Special Verdict Form and Instruction 40 was not erroneous.

¶40 Accordingly, we also reject Seumanu's claim of ineffective assistance. "To succeed on an ineffective assistance of counsel claim, [Seumanu] must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense." *See Beckering*, 2015 UT App 53, ¶ 21 (cleaned up). It is well established, however, that the "failure of counsel to make motions or objections which would be futile if raised does not constitute ineffective assistance." *State v. Whittle*, 1999 UT 96, ¶ 34, 989 P.2d 52 (cleaned up); *see also State v. Ricks*, 2013 UT App 238, ¶ 22, 314 P.3d 1033 ("The Sixth Amendment does not require counsel to make futile objections."). Thus, Seumanu's ineffective assistance claim must fail if objections to the Special Verdict Form and Instruction 40 would have been futile if raised. As shown above, there was no error in the Special Verdict Form or Instruction 40, as to the "as a party" language, so objections to either would have been futile.

### III. Cautionary Instruction

¶41 Finally, Seumanu argues that the trial court plainly erred by not sua sponte providing an accomplice instruction. Specifically, Seumanu argues that the trial court erred by ignoring its "obligat[ion] to properly apprise the jury of the potentially unreliable nature of the accomplices' testimony by means of a special cautionary instruction." (cleaned up). An

accomplice instruction is required only when (1) an accomplice (2) gives uncorroborated testimony, and (3) the judge finds the testimony "to be self contradictory, uncertain or improbable." *State v. Dunn*, 850 P.2d 1201, 1226 (Utah 1993) (quoting Utah Code section 77-17-7(2)). Otherwise, "the giving of a cautionary instruction is left to the trial court's discretion." *State v. Neeley*, 748 P.2d 1091, 1096 (Utah 1988).

¶42 This issue is not preserved, and we therefore review it for plain error. *See State v. Ringstad*, 2018 UT App 66, ¶ 32, 424 P.3d 1052. To demonstrate plain error, Seumanu must show that "(i) [a]n error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant, or phrased differently, our confidence in the verdict is undermined." *Dunn*, 850 P.2d at 1208–09.

¶43 Here, Seumanu cannot show error—let alone obvious error—because no accomplice instruction was required for two reasons. First, any accomplice testimony of Seumanu's whereabouts on the night of the kidnapping and murder was corroborated by non-accomplice testimony. Specifically, Seumanu admitted,[11] and Wife testified at trial, that he was at the Residence while Victim and Middleman were held at gunpoint and tied-up; he left the Residence with Leech, Myore, Victim, and Middleman; and Wife picked him up at the Residence in the morning. Thus, accomplice testimony placing Seumanu at the scene of the crime was sufficiently corroborated.

¶44 Second, Seumanu has not demonstrated that other accomplice testimony relevant to Seumanu's conduct and participation in the kidnapping and murder, *supra* ¶ 16, was so

---

11. Seumanu made several admissions to police during an interview. Those statements were admitted—without objection—when police later testified at trial. *See* Utah R. Evid. 801(d)(2).

obviously self-contradictory, uncertain, or improbable that the court's decision not to give an accomplice instruction was plainly in error. Seumanu's sole argument on this point is that each accomplice admitted generally to not being completely honest with police during the investigation. This falls short of showing that an accomplice instruction was obviously required. *Cf. State v. Marquina*, 2018 UT App 219, ¶ 49, 437 P.3d 628 (holding that uncorroborated accomplice testimony was sufficient when "as to the core issue—[the defendant's] involvement in the [crime]—the stories were consistent" and that "it was for the jury to weigh the evidence and to determine the credibility of the witnesses" (cleaned up)). Indeed, Seumanu's general argument that accomplices were not honest with police during their initial investigation does not demonstrate that the accomplice testimony at trial was inconsistent as to any specific fact, let alone a "core issue." And certainly, the nuance of the argument Seumanu now makes on appeal would not have been obvious to the trial court.

¶45 Because the aforementioned material testimony was either corroborated by Seumanu and his own witness, or otherwise not so obviously inconsistent that a cautionary accomplice instruction was required, *see* Utah Code Ann. § 77-17-7(2) (LexisNexis 2017), we conclude that the court did not commit plain error by not providing such an instruction.

¶46 Moreover, even if the trial court's decision not to give an accomplice instruction was obvious error, Seumanu cannot show that the error was harmful. *See Dunn*, 850 P.2d at 1208–09. Our supreme court has held that denying an accomplice instruction was harmless when the court instructed the jury to evaluate the witnesses' credibility and those credibility concerns were addressed at trial. *Id.* at 1226 (holding that any error was harmless where the jury had evidence of the accomplice's motivation to lie but received a general credibility instruction); *Neeley*, 748 P.2d at 1096 (holding that the court was within its discretion to deny a cautionary instruction where an accomplice

witness was thoroughly cross-examined and testimony was corroborated).

¶47    Here, the court instructed the jury on general witness credibility, and its decision to not provide an accomplice instruction therefore did not result in harm. Specifically, the trial court instructed jurors generally on witness credibility, including explicit instructions to consider whether any witnesses had a personal interest in the outcome of the trial or had some other bias or motive to testify a certain way. Under these circumstances, an accomplice instruction "was simply not necessary to prompt the jury to question [the] veracity" of the accomplice witnesses, because the testimony, the arguments, and the general instructions had already "alerted the jury to [their] possible motives[s] for testifying with less than total candor." *State v. Guzman*, 2004 UT App 211, ¶ 37, 95 P.3d 302.

¶48    Seumanu cannot show that an accomplice instruction was required, that the need to so instruct was obvious, or that the trial court's failure to provide such an accomplice instruction sua sponte caused any harm. Therefore, under a plain error analysis, Seumanu's claim fails.


## CONCLUSION

¶49    The State did not fail to provide adequate notice of its intent to seek a finding of "serious bodily injury," which could result in a sentence of life without parole, and such a finding was submitted to the jury and proved beyond a reasonable doubt. Additionally, Seumanu's trial counsel was not ineffective for failing to object to the Special Verdict Form and/or Instruction 40 because those instructions correctly informed the jury of accomplice liability theory potentially applicable to this appeal. Finally, the trial court did not commit plain error by not providing a cautionary accomplice instruction.

¶50    Affirmed.

―――――――